Council, No. 20-3092. Mr. Davich? Yes, good morning, Your Honors. I am Robert Davich. I represent the appellant in this case, Dr. Mustafa Barora. This is an appeal from order by the District Court granting summary judgment in favor of the defendant. We will call the defendant the funds and against Dr. Barora on his claim that he was terminated by the funds on August 10, 2015 because he had a disability in violation of the ADA and the local statutes that prohibit disability discrimination. Your Honors, this is not about whether or not Dr. Barora will win if the case goes to trial, if he's fortunate enough to get a trial. It's about whether or not he is entitled to a trial. And our position is that based on the record that was developed in discovery, he is in fact entitled to a trial, particularly on the issue of pretext, pretext. And there are five ways, we think, in which he could establish pretext, either alone or in combination, if he ever were to go to trial. And I think it would be a good idea for me to summarize briefly some of the salient facts. And everything I'm going to say, I believe, is supported by the record. So I won't keep saying so-and-so will testify. It has to be a pretext for discrimination. Yes. A pretext for discrimination because of his disability, which resulted from a fall that caused nine fractured ribs and a torn right rotator cuff. He slipped and fell on May 12, 2015 in a hospital. He was a licensed, is a licensed OBGYN. He was hired by the funds in January of 2010 as a result of the injuries he sustained in his fall. He was out of work until May 31. A physician cleared him to return to work as of May 31, but did not say in his note that he was fully recovered or that he had no restrictions. On the day he was supposed to go back to work, June 1, 2015, he calls his supervisor, the medical director of the health center, Dr. Sweeting. And he says to Dr. Sweeting, quote, I'm unable to move my right arm, end quote, end quote, I cannot see the patients because I'm just unable to move. I'm in so much pain, end quote. According to his testimony, Dr. Sweeting's response was, I don't care. This is not my problem. You must come in and see the patients. He returns to work on his next scheduled work day. He didn't have any choice. June 4th, and on at least three occasions after he went back to work, he told Dr. Sweeting that he still couldn't move or lift his right arm. He had been cleared medically by his doctor. He had been cleared to return to work. Yes, Your Honor, that is correct. So, so Dr. Sweeting from her point of view, this is a person who's been cleared by his own doctor. Right. However, as the district court pointed out, Dr. Barora's testimony was that he kept telling Dr. Sweeting after he returned to work, I can't move my right arm. I'm having trouble treating patients. I'm in severe pain. And I'm actually having to use my left arm to move my right arm. That's his testimony. And he said that in his answers to interrogatories. So let's move to what That's about six weeks after he returns to work. He's scheduled to work from 1 p.m. until 7 p.m. On that day, he goes to the radiology department for several minutes to have his right shoulder x-rayed and did not cause any disruption in his patient's schedule. About an hour later at 5.30, he sees an endocrinologist in the same building where his office was located because he was concerned about cancer. There was a nodule that appeared on a PET scan that showed his fractured ribs, and he wanted to see the endocrinologist to rule out cancer. He's away for that appointment for no more than 10 minutes. He testified that when he left, there were no patients waiting for him. He was only away for about 10 minutes. And then when he came back to work, his next scheduled patient was checking in at 5.40 p.m. The records show that at that point, he only had three more patients left to see for the rest of the day before he checked out at 7 o'clock. Now, Dr. Sweeting confronts him on July 9th and says, you can't see doctors for your own problems when you have other patients scheduled to be seen by you, and I should know about it at least. He defends himself to Dr. Sweeting. He says, doctor, I was only away for a few minutes. I had no patients waiting for me. There was no disruption in my schedule. Nevertheless, on the next day, July 10th, Dr. Sweeting sends an email to her boss, Dr. Jarvis, the CMO, and she says she found five patients waiting for Dr. Barora when he was visiting the hospital. Above all else, the patients were inconvenienced with longer than necessary wait time and later than necessary departure, end quote. Now, the District Court found that the events of July 9th were the precipitating factor in the recommendation to fire Dr. Barora. And in fact, the funds has admitted several times in their brief that that was what caused his termination, what he did on July 9th. Our position is that under the fund's own policy, an unauthorized absence from an assigned work area during working hours is a minor infraction that will lead to progressive corrective action. And nevertheless, he was fired. We say a jury could find that what he did fits within that definition, unauthorized absence from an assigned work area during working hours, minor infraction, progressive corrective action, and yet he was fired. So that's your pretext argument. I'm wondering if you could back up to the part of your prima facie case. You have to allege that his disability was the but-for cause of the termination. And I'm wondering what's the strongest evidence in the record that you can point to? You're asking about prima facie case, Your Honor? Yes. What's the evidence, the strongest evidence in your view that disability was the reason for his termination? Okay. So for prima facie case, first of all, under Second Circuit authority, it's a low standard. It's been described as a minimal or de minimis standard. That's the initial prima facie case. Right. But that ends when the employer comes forth with an explanation for the reason. At that point, the initial prima facie case just disappears. Correct. So the prima facie case we're talking about here is sufficient evidence to make it reasonable for a jury to find. Right. And the district court found that he had made... So minimal doesn't apply to that. Right. The district court did find that he made out a prima facie case. And our position is the same evidence that enables him to prove pretext makes out his prima facie case. And there's a decision by the Second Circuit, this Court, in Van... But the pretext issue turns on, it seems to me, the fact, factual dispute over whether, you know, this was a major or minor infraction. Yes, Your Honor. And I hear your argument on that. But how does that tie back to whether the but-for cause of the termination was disability? Well, it has to be... It doesn't have to be the but-cause. Under the Natofsky case, it has to be a but-cause, not the sole cause. And our position is that when we combine all the proof of pretext and prima facie case, a jury can determine that he was fired because of his disability. There's no direct evidence. I mean, there's no testimony that Dr. Sweeting said to you, Dr. Brewer, we're firing you because you have a torn rotator cuff. It has to be inferred. It can be inferred by the jury. Violation of the policy, that's number one. Number two, the funds changed their position in the litigation. It became theft of time in the litigation. And there's law that says when the explanation shifts or changes, that can be evidence of pretext. So now it's theft of time. He was never accused of theft of time before he was fired or at the time he was fired. Theft of time under the policy is a major infraction that can lead to termination, unlike a minor infraction such as an unauthorized... It was taking personal appointments during his shift. And so during litigation, they label that as theft of time, I assume, because that's what the policy language is. But that doesn't seem to be a change in the reasoning. Your Honor, we think that's a jury question. A jury can interpret the policy and decide whether it was really an unauthorized leaving of his post for 10 minutes, which would be a minor infraction, or whether it was theft of time, which would be a major infraction. That became an issue after the litigation started. But there's one other point, by the way. Sweeting mentioned several different things. Sweeting didn't limit the reasons of his misconduct to that. Sweeting also mentioned that he incidentally had requested to be put back on the work schedule after his doctor cleared him. And on June 1, when he was supposed to be there, he simply didn't show up. He didn't notify anybody. He didn't tell anybody. He just didn't come. Your Honor, the record shows that he did call Dr. Sweeting that morning, and he said, I can't come in because I can't move my arm. And he wasn't punished at that time on June 1. That didn't come up as a reason until a month later, on August 15, when Dr. Sweeting adds that to another memorandum. She goes back to June 1. In the initial July 10 memo, she says nothing about him skipping work on June 1. It comes up for the first time as an added reason on August 10. And the other point I want to make is that there's a core factual dispute on whether or not he committed the conduct that he was accused of. Doctor — and under the Supreme Court's decision in Sanderson, I believe that should go to the jury. Doctor Sweeting said that in her July 10 memo recommending termination that she found five patients waiting for him in the OB-GYN clinic when he was visiting the endocrinologist. And above all else — those were the words she used — above all else, patients were delayed and inconvenienced. Barora — Dr. Barora testified, that's not true. There was nobody waiting. There was nobody there. When I left, there was no patient there. When I came back, my next patient was checking in. That is a key factual dispute. And I submit to Your Honors that if the jury were to find that Dr. Barora is credible — and by the way, no patient gave testimony or a declaration. If a jury were to find that Dr. Barora is credible when he says, there was nobody there when I left for 10 minutes, my next patient was coming in, the jury under the case law can find a pretext. The primary asserted reason in that July 10 memo would then be determined to be false. And the only other point I want to make — I'm sorry I'm over time — is the issue of temporal proximity. He tells Dr. Sweeting on June 1 that he can't move his arm, he can't go to work. He then says to her several times after that, I can't move my arm, I can't lift my arm. On July 10, she recommends termination. Now, temporal proximity, standing alone, is not enough to establish pretext. But under the case law, in combination with the other facts that I've mentioned to Your Honors, that can be used by the jury to find pretext. There's a Second Circuit decision that holds that a time interval of five months is not too short to find temporal proximity. In this case, we have within six weeks. Thank you, Your Honors. Thank you, Counsel. Ms. Schmalz. May it please the Court. My name is Jennifer Schmalz from Elinoff, Grossman & Scholl, and I'm here on behalf of my client, which is the New York Hotel Trades Council and Hotel Association of New York City Employee Benefit Funds. And just to clarify, my client is a Taft-Hartley multi-employer benefit fund that services union employees in the hotel industry throughout New York City. And one of the funds is the health fund. And the health fund, which is funded by hotel employers, runs four health centers, one of which is the Queens Health Center where Dr. Berrara was employed on a part-time basis. And Dr. Berrara also maintains his own OB-GYN practice. But he worked a couple of days a week. He was an hourly employee. He was paid approximately $80 an hour by the funds to service the patients who were there, who are members of the union who are there, and their families for health services. And he had a schedule. He was expected to be there and abide by the schedule. And in the record, in the joint appendix, you will see on the day July 9th in question, when he attended these personal health care appointments, if you look at the joint appendix 130 to 132, it is three pages of the patients who he was scheduled to see that day. And those patients, some of which were scheduled at exactly the same point in time when he was supposed to be seeing patients, he was in fact not once but twice left the OB-GYN to attend to his own medical needs. And that, Your Honors, is theft of time. That is a dereliction of duties. It is leaving your work area when you are being paid to attend to patients. And instead, he was not doing what he was being paid to do by the funds. Now, on in terms of- So Dr. Sweeting, your adversary argues, did not call that theft of time. That seems to be a label that was added during litigation. What's your response to that? Yes. Dr. Sweeting, in her July, in the memo that she wrote, it's an e-mail, actually, that she wrote to her supervisor, Dr. Jarvis, the very next day, July 10th, after the incidents occurred, she said that he went, he left, he kept patients waiting, and that he, you know, left and went to see an endocrinologist and he went to radiology. Even though she didn't specifically label that as theft of time, she was communicating to her supervisor what had happened. And Dr. Sweeting is a physician. She's not a human resources representative. You know, she was conveying what had occurred. But the fact of the matter is when an employee is on the clock and expected to be working and they leave their work area to attend to personal business, that is not permissible in any workforce that I'm aware of. That is theft of time. You are expected, when you are at work, to be performing the services that your employer is paying you to do. And in this circumstance, that was not what occurred. So, and I would like to address that argument about failure to follow the handbook or the company policy. The handbook, which is in the record, again, in the joint appendix, also shows that theft of time is a major infraction. And I also would like to point out that it is very well settled in the courts that in discrimination cases, the courts are not supposed to serve as super personnel departments. You are not supposed to second guess an employer's decision in its disciplinary actions. And here, that's not what's at issue. As long as it's clear that the employer relies on its policies in making those decisions, which clearly here it did. It clearly relied on its policies as outlined in the reasons for termination. In that case, the courts do not second guess the personnel decisions of employers. The issue here is whether there's a discriminatory motive, whether they can prove pretext. And the fact is— You're not saying, are you, that, I mean, supposing that there were a case in which there was substantial evidence of a discriminatory motivation, you're not saying that the fact that the employer can dress it up as a—placing the reason as something that came within a policy, if a jury would find this employer was discriminating against this class of persons, that the fact that the employer can point to a policy that could explain it will—prevents a court from finding discrimination that was obviously present? No, absolutely not, Your Honor. Mr. Davich, what he argued was that this is a minor infraction, that he should not have been terminated for this. And what I'm saying is the decision to terminate the level of discipline is something that the courts leave to the employer. Not—I agree with you 100%. If there was evidence here in this case of discriminatory motive, an employer can't just point to their policy and say, this is why we made this decision. But the fact of the matter is, is there is not evidence here of discriminatory motive. And the allegations that there was some kind of shifting reasons for why this decision to terminate was made is entirely inconsistent with the record evidence. Both the—both memos, both the email in July and the final termination recommendation subsequently submitted by Dr. Sweeting, both rely on this conduct of July 9th. Now, she does cite to some prior—prior disciplinary issues, which is not uncommon in the human resources world. When you are going to terminate someone, you reflect on their entire—their employment record. And she mentioned the fact that Dr. Barrara, on June 1st, the day that he had asked to be put back on the schedule, the day that he had said—he had actually gone in, presented the note saying, I'm cleared to return to work, put me back on the schedule. And that very day, he did not arrive for work. And you are correct, Your Honor, he did not call. Human resources—it's in the record. Human resources contacted him. And he admitted in his deposition testimony that he just didn't show up for work that day. And, again, that is something that is—no employer is expected to tolerate that. Now, he was not terminated for that because that is not—that was not considered at that time an offense serious enough to terminate his employment. But the offenses that he committed on July 9th clearly are the impetus for his termination. They were the events, the leaving his work area. The employer is certainly entitled to consider a cumulative series of misconducts, even—I mean, it's not unusual for an employee to commit a misconduct, which then passes and results in no discipline, but then becomes a factor when it's added to later—repeated later infractions to be added to those as a reason for a termination. Absolutely. And, Your Honor, this—these emails and memos that were being sent were being sent to Vincent Jarvis, who was the medical director for the entire funds for all of the health centers. And I believe that, you know, if you look at this July 10th email, it's copied also on Serena Jean-Louis, who was the administrator for the funds. She was the administrator for the Queens Health Center. She was present there that day as well. And in the email, I think the motivation is very clear for Doreen Sweeting, for Dr. Sweeting, in terms of why she was recommending the termination. She said, above all else, the patients were inconvenienced with longer-than-necessary wait times and later-than-necessary departures. Serena agreed that termination is appropriate at this time. And whether it was one patient, three patients, or five patients waiting for—for Dr. Berrara is irrelevant. That fact doesn't change—that doesn't create an issue of whether this—this case involved disability discrimination or whether Dr. Sweeting was motivated by disability discrimination. The fact is, he had a schedule of patients, and his dedication should have been there to seeing those patients during that period of time. And instead, he chose to—he chose to attend these medical appointments, you know, instead of dedicating himself to seeing the patients. And the employer, the funds, the health center has the right to expect him, when he is on the job and being paid, to be dedicated to the schedule of patients that he has. So, in conclusion, Your Honor, the funds request that you affirm the very well-thought-out and very meticulous and detailed decision that Judge Freeman issued the memorandum and order granting our motion for summary judgment. Thank you very much. Thank you, counsel. We'll take the case under advisement.